IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| v. | : | |
| BIOCOMPATIBLES, INC., | : | VIOLATION:<br>21 U.S.C. §§ 331(a) and 333(a)(1) |
| Defendant. | : | (Causing the introduction into interstate commerce of a misbranded |
| | : | medical device) |
| | : | FORFEITURE: 28 U.S.C. § 2461;<br>21 U.S.C. §§ 334, 853(p); and |
| | : | 18 U.S.C. § 981(a)(7) |

## INFORMATION

The United States Attorney charges that:

## COUNT ONE

At all times material to this Information:

### Background

1. At all relevant times, Biocompatibles UK Ltd. was an English entity with its principal place of business in Great Britain. In or about 2008, Biocompatibles UK Ltd. acquired an entity that became Defendant BIOCOMPATIBLES, INC., a Delaware corporation, with its principal place of business in Oxford, Connecticut. These entities are collectively referred to herein as "BIOCOMPATIBLES." After December 31, 2010, BIOCOMPATIBLES became a wholly owned subsidiary of Biocompatibles International Ltd, an English entity, and assumed the business of Biocompatibles UK.

2. Defendant BIOCOMPATIBLES developed, manufactured, marketed, sold, and distributed a medical device that at various times was named GelSpheres Embolic Agent, GelSpheres Compressible Microspheres, and LC Bead® (hereinafter "LC Bead®"). Defendant BIOCOMPATIBLES shipped LC Bead® in interstate commerce, which ultimately was delivered to health care providers throughout the United States, including the District of Columbia ("the District"). LC Bead® was used by physicians throughout the United States, including the District.

3. Defendant BIOCOMPATIBLES lacked a sales force and contracted with other companies to promote and to distribute LC Bead®. From on or about July 1, 2005, through on or about May 21, 2006, Company 1, which was based in Japan but had a sales force in the United States, was Defendant BIOCOMPATIBLES' exclusive distributor of LC Bead® in the United States. Beginning on or about May 22, 2006, Company 2, which was based in the United States, became Defendant BIOCOMPATIBLES' exclusive distributor of LC Bead® in the United States. On or about January 29, 2007, Company 2 was acquired by Company 3, which was based in the United States. From on or about January 29, 2007, through on or about December 31, 2011, Company 3 was Defendant BIOCOMPATIBLES' exclusive distributor of LC Bead® in the United States.

4. The United States Food and Drug Administration ("FDA"), an agency within the United States Department of Health and Human Services, was responsible for protecting the health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act ("FDCA"). One of the purposes of the FDCA was – and is – to ensure that medical devices sold for human use are safe and effective. The FDCA

requires that medical devices bear labeling that contains only true and accurate information and that provides adequate directions for use. The FDA's responsibilities under the FDCA include regulating the manufacture, labeling, and distribution of all medical devices shipped or received in interstate commerce.

5. The FDCA defines a medical "device," in relevant part, as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or . . . intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321(h).

6. Under the FDCA, the term "labeling" is defined as all labels and other printed or graphic matter upon any article, including medical devices, or any of its containers or wrappers, or accompanying such articles. 21 U.S.C. § 321(m).

7. The FDCA and its implementing regulations prohibited manufacturers from distributing in interstate commerce any medical device unless the FDA had granted marketing authorization for the device or the device was covered by an exemption not applicable here. There generally were two ways for a manufacturer to obtain FDA marketing authorization for a medical device.

8. The first way for the manufacturer to distribute lawfully a medical device was by obtaining FDA approval of the manufacturer's application for pre-market

approval of the device ("PMA approval"). The FDA would not grant PMA approval unless the information in the PMA application provided the FDA with reasonable assurance that the device was safe and effective for its intended use, as reflected in its FDA-approved labeling.

9. The second way for the manufacturer to distribute lawfully a medical device was by obtaining FDA clearance that the medical device was substantially equivalent to a device that already was legally being marketed, *i.e.*, a "predicate device." This process was referred to as a "510(k) clearance." The FDA would grant 510(k) clearance if it determined, among other things, that the device had the same intended use as the predicate device and did not raise new issues of safety or effectiveness.

10. Defendant BIOCOMPATIBLES communicated with the FDA primarily through a consultant based in the United States whom Defendant BIOCOMPATIBLES identified to the FDA as its "official correspondent and U.S. Foreign Agent" (hereinafter Defendant BIOCOMPATIBLES' "consultant"). All of the communications from Defendant BIOCOMPATIBLES' consultant to the FDA described below were made with Defendant BIOCOMPATIBLES' knowledge and approval.

11. Under the FDCA, a medical device is misbranded if the labeling on the device lacks adequate directions for its intended use. 21 U.S.C. § 352(f)(1); 21 C.F.R. § 801.5.

12. The FDCA prohibits the introduction, delivery for introduction, or causing the introduction for delivery into interstate commerce of a misbranded device. 21 U.S.C. § 331(a).

4

13. LC Bead® was a medical device within the meaning of the FDCA. LC Bead® was used primarily to treat patients with advanced liver cancer. These patients typically were too sick to be eligible for liver transplants and had liver tumors that were too large, or too prominent in the liver, to be surgically removed. On or about December 16, 2002, the FDA granted 510(k) clearance for LC Bead® to be used "for Embolization of hypervascular tumors and arteriovenous malformations." LC Bead® could be used as an embolic device in which the device was inserted by catheter into the blood vessels and positioned outside, or within, the liver to block the flow of blood to the liver tumor. The FDA subsequently granted 510(k) clearances to Defendant BIOCOMPATIBLES for LC Bead® on or about February 4, 2004, November 12, 2004, December 24, 2008, and April 16, 2010, for changes such as manufacturing LC Bead® at a different location and distributing a different-sized bead. In each of those 510(k) clearances, the indicated use for LC Bead® remained the same: embolization of hypervascular tumors and arteriovenous malformations.

## Misbranded Medical Devices

14. On or about November 5, 2004, the FDA raised concerns with Defendant BIOCOMPATIBLES – which was at that time seeking 510(k) clearance for a change in LC Bead®'s manufacturing site – about whether the company would use LC Bead®'s 510(k) embolization clearance to promote LC Bead® for drug delivery. The FDA told Defendant BIOCOMPATIBLES' consultant that separate FDA marketing authorization would be needed for "drug-loaded beads . . . for any indication." The FDA requested a statement that Defendant BIOCOMPATIBLES' understood that separate approval would be needed.

15. On or about November 6, 2004, Defendant BIOCOMPATIBLES consultant stated in an emailed response to the FDA that "under no circumstance" would the 510(k) clearance application for LC Bead® "be use[d] to promote Drug Loading By Doctors!" Defendant BIOCOMPATIBLES' consultant added: "I Guarantee that there is no sl[e]ight of hand here."

16. On or about November 7, 2004, Defendant BIOCOMPATIBLES' consultant stated in a letter to the FDA that Defendant BIOCOMPATIBLES would market LC Bead® for only the embolization indication in the 510(k) application. The letter stated that Defendant BIOCOMPATIBLES did "not plan to market or promote [LC Bead®] for the specific indication of Pre-loading any pharmaceutical, in the USA until such time that a 510K has been cleared for the appropriate indications for use." The letter, which was signed by Defendant BIOCOMPATIBLES' consultant, also stated that "[t]his letter is sent with the knowledge by and prior approval of" Defendant BIOCOMPATIBLES.

17. At the time Defendant BIOCOMPATIBLES began distributing LC Bead® in the United States in or around July 2005, health care providers used LC Bead® almost exclusively as a drug-delivery device. For this use, the device was loaded with chemotherapy drugs, inserted by catheter into the blood vessels, and positioned outside, or within, the liver, where the device reduced the flow of blood to the liver tumor and emitted chemotherapy drugs to attack the liver tumor. The FDA did not approve or clear LC Bead® for use as a drug-delivery device.

18. In 2004, Biocompatibles did not have a plan to market LC Bead® in the United States as a drug-delivery device without the FDA's 510(k) clearance or

PMA approval for that use. Subsequently, however, Biocompatibles, through its distributors, marketed LC Bead® in the United States as a drug-delivery device despite having neither 510(k) clearance or PMA approval for that use.

19. On or about October 10, 2006, Defendant BIOCOMPATIBLES applied to the FDA for 510(k) clearance for LC Bead® for "Embolization of hypervascular tumors and arteriovenous malformations (AVM's) and in Trans Arterial Chemo Embolization (TACE)."

20. On or about March 9, 2007, the FDA informed Defendant BIOCOMPATIBLES that using LC Bead® to deliver drugs constituted "a new indication" and that the device was not substantially equivalent to any predicate device because of the new indication for use in TACE, which "alters the therapeutic effect, impacting safety and effectiveness," and for which there was no predicate device. The FDA, therefore, informed Defendant BIOCOMPATIBLES that it would need PMA approval before the device could be legally marketed for the proposed intended use.

21. On or about December 11, 2009, Defendant BIOCOMPATIBLES filed a PMA application for LC Bead® to be used for drug delivery.

22. On or about February 5, 2010, the FDA informed Defendant BIOCOMPATIBLES that it was refusing to file the PMA because it was deficient. The FDA informed Defendant BIOCOMPATIBLES that the FDA would not review the PMA until the deficiencies were corrected. The FDA's letter to Defendant BIOCOMPATIBLES stated that in order for the FDA to file the PMA, Defendant BIOCOMPATIBLES would need to include clinical data adequately demonstrating "a survival benefit" and a "statistically meaningful benefit in quality of life" measures.

23. From on or about May 22, 2006, through on or about December 31, 2010, Defendant BIOCOMPATIBLES, in the District and elsewhere, aided and abetted the distribution of LC Bead® intending that it be used as a device to deliver chemotherapy drugs, even though LC Bead® had been cleared by the FDA only as a device to be used for embolization. Specifically, Companies 2 and 3, with Defendant BIOCOMPATIBLES' knowledge and consent, developed a plan to market and to distribute LC Bead® as a drug-delivery device.

24. From on or about May 22, 2006, through on or about December 31, 2010, Companies 2 and 3's sales representatives, consistent with the marketing plan that Defendant BIOCOMPATIBLES approved, encouraged health care providers, in the District and elsewhere, to use LC Bead® for drug delivery and demonstrated to health care providers how to use LC Bead® to deliver drugs. Defendant BIOCOMPATIBLES' employees misled health care providers, in that there was no or insufficient data accepted by the FDA at that time to demonstrate that LC Bead® was safe and effective for use as a device to deliver chemotherapy drugs. Defendant BIOCOMPATIBLES engaged in this conduct despite: (a) pledging to the FDA on or about November 6, 2004, that it would not promote LC Bead® as a drug-delivery device; (b) being explicitly informed by the FDA that separate FDA marketing authorization was required to distribute LC Bead® as a drug-delivery device; and (c) attempting and failing to obtain both 510(k) clearance and PMA approval to market LC Bead® as a drug-delivery device.

25. From on or about May 22, 2006, through on or about December 31, 2010, Defendant BIOCOMPATIBLES received a gain in the amount of $8,751,673

by unlawfully distributing LC Bead® for the unapproved and uncleared intended use as a drug-delivery device.

26. From on or about May 22, 2006, through on or about December 31, 2010, in the District and elsewhere, Defendant

**BIOCOMPATIBLES, INC.,**

caused the introduction into interstate commerce of LC Bead®, which was a device within the meaning of 21 U.S.C. § 321(h), and which was misbranded because its labeling lacked adequate directions for its intended use as a drug-delivery device, in violation of 21 U.S.C. § 352(f)(1).

**(In violation of Title 21, United States Code, Sections 331(a) and 333(a)(1))**

**FORFEITURE ALLEGATIONS**

1. Upon conviction of Count One of this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense and all right, title, and interest in any medical device that is misbranded when introduced into or while in interstate commerce or while held for sale after shipment in interstate commerce, or which may not, under the provisions of 21 U.S.C. § 331, be introduced into interstate commerce, pursuant to 18 U.S.C. § 982(a)(7), 21 U.S.C. § 334, and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the defendant in the amount of $2,248,327.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of this Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, 981(a)(7), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Sections 334 and 853(p)).**

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

_____
Virginia Cheatham
Assistant United States Attorney
555 Fourth St., N.W., Fifth Floor
Washington, D.C. 20530
Bar No. DC – 411980
202-252-7820
virginia.cheatham@usdoj.gov

_____
Patrick Jasperse
Senior Litigation Counsel
U.S. Department of Justice
Consumer Protection Branch
450 Fifth St., N.W., Sixth Floor South
Washington, D.C. 20001
D.C. Bar Number 986804
202-616-0509
patrick.jasperse@usdoj.gov